IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| SHERMAN WILSON, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-06-4129 |
| | § | |
| KENNETH PATMON, *et al.,* | § | |
| | § | |
| *Defendants.* | § | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Sherman Wilson, proceeding *pro se* and *in forma pauperis*, filed this section 1983 lawsuit alleging violations of his civil rights by Rosenberg Police Department police officers Kenneth Patmon and Darnell Chatman. Defendant Patmon filed a motion for summary judgment (Docket Entry No. 27), to which plaintiff filed a response (Docket Entry No. 33).

Based on consideration of the pleadings, the motion and response, the probative summary judgment evidence, and the applicable law, the Court **GRANTS** the motion for summary judgment and **DISMISSES** plaintiff's claims against Kenneth Patmon for the reasons that follow.

### I. BACKGROUND AND CLAIMS

Plaintiff reports in his complaint that, one Saturday morning in March of 2006, he was stopped by police officers Patmon and Chatman while walking down a street in Rosenberg,

Texas. (Docket Entry No. 1, p. 4.) Plaintiff alleges that the officers told him he was walking on the wrong side of the street, and ordered him to remove his socks, shoes, baseball cap, glasses, shirt, and pants. The officers then searched his clothing while plaintiff stood "in the middle of [the] road on a cold morning barefoot and naked." (Docket Entry No. 1, p. 4.) Plaintiff claims this incident was an unlawful strip search and requests damages in an amount of $1 million dollars for violation of his Fourth Amendment rights.

In his more definite statement (MDS), plaintiff states that, after the officers stopped him, "I was told to assume the position. He began to pat me down. I was ordered to remove my cap. I did. It was searched. I'm not under arrest at this point or never was under arrest before or after the removal of my clothing." (Docket Entry No. 13, p. 1.) Elsewhere in his MDS, plaintiff asserts that the officers stripped him and left him "standing only in boxers." *Id.*, p. 3. Plaintiff argues that the officers stopped and searched him without reasonable justifiable or probable cause. *Id.*, p. 2. During his deposition, plaintiff asserted that Patmon was directing Chatman throughout the stop, and that Chatman ordered plaintiff to remove his shirt and pants at the direction of Patmon.

In his motion for summary judgment, defendant Patmon argues that plaintiff, a known criminal with a history of drug activity, violence, and disruptive behavior, was observed walking down the wrong side of the street in an area known for drug activity. (Docket Entry No. 27, p. 3.) The officers stopped him, and obtained his consent to be searched. The actual pat-down search lasted four minutes, and was videotaped on an on-board parol car camera.

2

Patmon alleges that, during the pat-down, plaintiff became extremely agitated and removed his own shirt and pants in anger. *Id.*, p. 6. Patmon further argues that he is not liable under any supervisory capacity because he did not instruct Chatman to strip search plaintiff, and because plaintiff removed his shirt and pants on his own initiative. Defendant Patmon argues that plaintiff's claims against him fail as a matter of law and should be dismissed.

## II. THE MOTION FOR SUMMARY JUDGMENT

### A.    Standard of Review

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits filed in support of the motion, show that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). In deciding a motion for summary judgment, the district court must determine whether the pleadings and records indicate if there is a genuine issue regarding any material fact and whether the moving party is entitled to judgment as a matter of law. *Id.*; *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

The party moving for summary judgment has the initial burden of demonstrating the absence of a material fact issue. *Kee v. City of Rowlett*, 247 F.3d 206, 210 (5th Cir. 2001). To meet this burden, the movant must present evidence that shows that the non-movant cannot carry its burden of proof at trial. *Smith v. Brenoettsy*, 158 F.3d 908, 911 (5th Cir. 1998). The movant may accomplish this by showing that the non-moving party has presented

3

no evidence in support of his claim. *Stahl v. Novartis Pharmaceuticals Corp.*, 283 F.3d 254, 263 (5th Cir. 2002). Once the movant has met this burden, the burden shifts to the non-movant to present specific facts showing that there is a genuine issue for trial; otherwise, summary judgment will be entered in favor of the movant. *Hart v. Hairston*, 343 F.3d 762, 764 (5th Cir. 2003).

## B.    Factual Analysis

Plaintiff claims that defendant Patmon violated his Fourth Amendment rights by strip searching him without probable cause during the winter on a public road in front of other people. According to plaintiff, Chatman ordered him to undress, then left him walking "butt naked" down the street. Plaintiff admits he consented to a search after he was stopped, but argues that he never consented to a strip search.[1] In short, plaintiff claims that he neither consented to, nor did the officers have probable cause for, a strip search involving the removal of his shirt and pants in public. Plaintiff states that, although it was Chatman who performed the actual search, Patmon was in the parol car providing instructions and directions to Chatman.

---

[1] The Fifth Circuit recognizes that a strip search involves a "danger of embarrassment: where, in short, the suspect is forced to disrobe to a state which would be offensive to the average person. Judged by this standard, the removal of a boot is surely not a 'strip.' Rather, it is like one removing an overcoat or a suit jacket." *U.S. v. Sandler*, 644 F.2d 1163, 1168 (5th Cir. 1981). Although plaintiff repeatedly states he was "butt naked," the police videotape clearly shows he did not remove his boxer shorts. Accordingly, this Court will focus on plaintiff's allegation that he was forced to remove his pants and shirt in public, leaving him standing in the street in his boxer shorts.

4

In his motion for summary judgment, Patmon asserts that he observed plaintiff violating section 552.006 of the Texas Transportation Code, a misdemeanor offense, by walking down the wrong side of the street; that he had reasonable suspicion to stop plaintiff then frisk him for weapons; and that he had arguable probable cause to search plaintiff. (Docket Entry No. 27, p. 2.) He argues that plaintiff became angry during the search and removed his own shirt and pants.

As an initial consideration, the Court notes that the uncontroverted evidence shows that plaintiff was walking on the wrong side of the street in violation of state law, and that he consented to a search after he was stopped. Plaintiff claims, however, that he did not consent to a strip search, and that the officers violated his Fourth Amendment rights by forcing him to remove his clothing and stand "butt naked" in public. Thus, the Court construes plaintiff's claim as a challenge to the *scope* of the search conducted by the officers.

Given these arguments, the Court initially must determine whether plaintiff presented probative summary judgment evidence that Patmon instructed Chatman to order plaintiff's shirt and pants removed during the search; that is, whether Patmon directed Chatman to conduct a strip search of plaintiff. Only if this underlying factual basis for plaintiff's claim appears in the record, must the Court then determine whether the strip search was unlawful. For purposes of this latter legal analysis, the Court presumes that plaintiff's consent to being searched did not legally or factually extend to being strip searched on a public road.

5

To this end, the Court has carefully examined plaintiff's videotaped and transcribed deposition, his transcribed and recorded interview with Lieutenant Davidson, the summary judgment affidavits, the police videotape (recorded without audio), plaintiff's response to the motion for summary judgment, and his verified MDS. An analysis of these documents and evidentiary sources is as follows.

    i.    Plaintiff's MDS

In his MDS, plaintiff testifies that,

> Officers Patmon and Chatman sounded their siren and turned on the unit's lights. Officer Chatman exited the driver's side and informed me that I was walking on the wrong side of the road. I proceeded with our conversation saying, 'What side is the right side?' I was told to assume the position. He began to pat me down. I was ordered to remove my cap. I did.[2] It was searched. I'm not under arrest at this point or never was under arrest before or after the removal of my clothing.
>
>         *   *   *   *
>
> I was ordered to remove my clothing in public and was not under arrest at the time I was ordered to do so.

(Docket Entry No. 13, pp. 2-3.) Plaintiff denied that he was violating any law when he was stopped, and stated that, "I had not done or participated in any criminal act. I merely was walking down Ave. E to Rev. Johnson." Plaintiff admitted, however, that he did not know which side of the road was the proper side: "Walking on the wrong side of the road. What is the right side to walk on?" He further argued that the law recognized " a clearly established

---

[2]The police videotape shows that Chatman, not plaintiff, removed the cap for examination.

constitutional right any reasonable person would know not to strip a man naked in the middle of the street, barefoot and left standing only in boxers." *Id.*, p. 3.

Accordingly, plaintiff's MDS fails to raise an issue of material fact as to whether he was walking on the wrong side of the street in violation of state law. Further, it narrows his claim to an assertion that the officers strip searched him without probable cause and in violation of his Fourth Amendment rights. It falls short, however, of raising a genuine issue of material fact as to whether he was ordered to remove his shirt and pants, particularly in light of plaintiff's other statements and testimony, as shown below.

      ii.    The Police Videotape

The officers' on-board camera videotaped the incident without audio. Consequently, the Court has reviewed the videotape, but cannot ascertain what statements were made by the parties during the incident.

The videotape does show that, at the time he was stopped, plaintiff was dressed in a short-sleeve polo shirt, long pants, dark socks, black high-top sneakers, and a baseball cap. It further shows that the officer's pat-down of plaintiff took approximately four minutes; that the officer removed, examined, and replaced plaintiff's baseball cap; that plaintiff removed his socks and shoes, and that the officer physically examined the shoes; and that plaintiff then removed his shirt and pants. The police officer did not physically examine plaintiff after plaintiff removed his shirt and pants, nor did he independently examine these items of

clothing. The officer gestured to plaintiff's shirt and pants, and plaintiff put them back on. At the end of the videotape, plaintiff was fully dressed. (Docket Entry No. 27, Exhibit 5.)

The videotape does not disclose whether the officers ordered plaintiff to remove his shirt and pants, or whether plaintiff removed his own shirt and pants in reaction to the pat-down search. The videotape does, however, refute plaintiff's claim that, after the stop, he was forced to walk down the street naked holding his clothing. The Supreme Court recently held that, "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, __ U.S. __, 127 S. Ct. 1769, 1775-76 (2007) (discussing incontrovertible facts established by a police videotape of the underlying incident). Officer Patmon authenticated the instant videotape (Docket Entry No. 27, Exhibit 2, pp. 1-2), and plaintiff raises no objection to the videotape's authenticity or completeness. Accordingly, under *Scott*, plaintiff cannot rely on the videotape as raising a genuine issue of material fact that the officers forced him to remove his shirt and pants and walk down the street naked following the stop.

    iii.    <u>The Interview with Lieutenant Davidson</u>

According to the record, Rosenberg Police Department Officer Colin Davidson interviewed plaintiff on April 20, 2006, regarding the incident. The interview was recorded and transcribed, and a copy of the interview was submitted to the Court. (Docket Entry No.

27, Exhibit 7.)  The interview transcription reflects the following relevant exchanges between

Davidson (D) and plaintiff (P):

> D:    Okay.  So when they stopped you, you said that they asked you to put your hands on the car?
>
> P:    Exactly.

*Id.*, p. 2.

> D:    So he asked you if he could search you, right?
>
> P:    Exactly.
>
> D:    Okay.  And you told him.
>
> P:    I told him, I said 'What are you stopping me for?  Yeah, I'm at the position, you want to search, search.  What are you looking for.'
>
> D:    *So you gave him permission to search, yes or no?*
>
> P:    *Yes.*
>
> D:    Okay, continue.
>
> P:    *Permission to do a routine search.*
>
> D:    Alright.
>
> P:    *Like they usually do, the pat-down.*
>
> D:    Right, right.
>
> P:    *So he's going to search me, a routine search, which I had no problem with.*
>
> D:    Right.

P:     But then he wanted me to take off my eyeglasses, take off my cap, he['s] all in the brim of my cap.  He's all in the hem of my shirt, along the hems of the sleeves of my shirt, along the collar of my shirt.  Then he starts beating off [unintelligible][.]

D:     Okay, let's back up a little bit.  Your [sic] talking about the shirt.  Do you just offer to take the shirt off?

P:     No!

D:     Okay.  Does he ask you to take the shirt off?

P:     He asked me to pull my shirt off.

D:     [P]ull it off or up?

P:     I pulled it off.  I had my shirt tails tucked in.

D:     Well, you said earlier that he asked you to pull it up.

P:     *I told him he told me to pull the shirt up.*

D:     Okay.

P:     *So I pulled it up.  Then he was down in my pants pulling on the hem. I tell him do you want me to take the damn thing off, here take the [son] of a [bitch].*

D:     And you took the shirt off.

P:     *I took the shirt off.*

D:     So he didn't ask you to take the shirt off, he just asked you to pull the shirt up, right?

P:     Pull the shirt up.

D:     Right.  You took your own shirt off.

P:    I took my own shirt off.

D:    Did he ask you to take your shirt off?  Cause I think. [sic]

P:    Basically, yeah he did. *But I can't remember.*

D:    You didn't hear him say that?

P:    *I don't know.*

D:    Okay, you don't remember?

P:    *I don't remember.*

D:    Okay.  Now.

P:    This was going so fast man.  I was really hot.

*Id.*, pp. 2-4 (emphasis added).

P:    I was real mad.

D:    [A]nd then he begins to pat down the outside of your clothing as far as your pants go up.  You've already taken your shirt off voluntarily.

P:    Voluntarily.  Is that what you all want to say?

D:    No, I'm asking you because I wasn't there.

P:    The man had my shirt and my pants.  Here man, he said pull it up, I pulled it up.

D:    And then you take it off.

P:    *He's searching around, he feels all around the hem of, all around my [ass].  I said wait a minute, f__ this.  Here take the damn shirt.*

D:    Okay.  And so then you go and he checks the hem of your pants.

11

P:      Then he starts roaming around the rim of my pants, like this.

*Id.*, pp. 4-5 (original abbreviated words, emphasis added).

P:      And then tucks his hands down in [unintelligible][.]  *Wait a minute man, hold on, get out my m___f__ing [ass], here take these [goddamn] pants.*

*Id.*, p. 5 (original abbreviated words, emphasis added).

P:      I took my pants off.  I'm not gonna let no man take my pants off.

D:      Okay.  So you took, *did he ask you to take your pants off?  Sherman, did he ask you[.]*

P:      *This interview is over.*

*Id.*, pp. 5-6 (emphasis added).

P:      He wanted me to take my pants off undoubtedly, because he searching in all my [goddamn], around my ass.  I don't like that kind of shit.  You don't search no person like that.

*Id.*, p. 6.

D:      Right, so did he ask you to take your pants off or did you just take them off because you were upset and decided to take them off yourself?

P:      He's feeling inside my pants, with my pants buckled up and belted down.

D:      Okay.

P:      And I was pissed off because he got his hands all down my trousers, in the front of my trousers, and in the back of my trousers, with my pants[.]

D:      Okay.

P:    *I said, "Wait a minute, hold on, you're not gonna make no punk out of me. Take these [goddamn] pants, what you want, what you looking for?*

D:    So that's when he, [t]hat's when you?

P:    *That's when I took my pants off and threw them on the LTD. Go ahead and take them.*

D:    And did he ask you to take your shoes off?

P:    He did.

D:    And did he check your shoes?

P:    He checked my shoes.  He checked my hat.  He checked my eye glasses.

D:    Did he ask you to take your socks off?

P:    Yes, sir.

D:    Okay.

P:    He even checked my drawers and I wasn't pulling my [goddamn] drawers off, cause I had on my silk Perry Ellis and there were two female officers out there.

D:    I understand.  So the things he asked you to take off – wait, I want to get this right – your hat.

P:    My glasses.

D:    Your glasses.

P:    My shoes.

D:    Your shoes.

P:    My socks.

      D:     And your socks.

*Id.*, pp. 6-8 (emphasis added).

      P:     This guy told me, he said, "Pull your shirt up." I pulled my shirt up. He stuck his hands down there, doing all around like this. How come [unintelligible]. Take the f__ing shirt.

      D:     *But he didn't ask you to take your shirt off.*

      P:     *I'm done.*

*Id.*, p. 8 (original abbreviated word).

      P:     He's in my pants. He's in all my clothes.

      D:     Okay.

      P:     Unnecessarily.

      D:     Okay.

      P:     For walking on the wrong side of the road.

*Id.*, p. 9. Plaintiff does not contest, or otherwise object to, the validity and completeness of the interview or the transcript.

Plaintiff stated in the interview that, after the officers finished the search, he walked "down the middle of the road, butt naked in my drawers." *Id.*, p. 11. A review of the police videotape, however, clearly shows that plaintiff walked away fully clothed when he was released by the police officers. *Id.*, Exhibit 5. Plaintiff's claim that the officers forced him to leave the scene wearing his boxer shorts is "blatantly contradicted by the record, so that

14

no reasonable jury could believe it[.]" *See Scott v. Harris*, __ U.S. __, 127 S. Ct. 1769, 1776 (2007).

Plaintiff's interview shows that he consented to the original search and assumed it would be a "routine" search.  It further shows that plaintiff did *not* report to Davidson that the officers ordered plaintiff to remove his shirt and pants.  When directly asked those questions, plaintiff stated that he "did not remember" or avoided answering the questions by attempting to terminate the interview.  To the contrary, plaintiff's statements to Davidson, taken as a whole and in context, show that plaintiff did not want Chatman's hands moving around inside and under his pants and shirt, and that he removed his own shirt and pants in absence of any order or request from the officers.

    iv.    <u>Plaintiff's Deposition</u>

In addition to the statements made in his interview with Davidson, plaintiff testified at his deposition, in relevant part, as follows:

> Q:    And after – after you had removed the things from your pockets, then how did [Officer Chatman] proceed with the pat-down?
>
> A:    'Take off your cap.'
>
> Q:    And did you remove your cap, or did he remove your cap?
>
> A:    I removed my cap.[3]
>
> Q:    Okay.

---

[3]The actual videotape reflects that Chatman removed and examined plaintiff's cap, then placed it back on plaintiff's head.  (Docket Entry No. 27, Exhibit 5.)

15

A:    And then he said, 'Take off your glasses.' I'm going to do what
      that officer says do [be]cause I know dirty, low-down [Officer
      Patmon] is in the car and smiling away. 'Take off your shoes
      and your socks.'

Q:    Did you remove your shoes and socks?

A:    Yeah.

Q:    And then what did he say?

A:    'Take off your shirt.'

Q:    Did he tell you to take off the shirt or pull up the shirt?

A:    Tell you what we're going to do. Get me the videotape. I'm not
      going to answer that yet. Get me the videotape from both of
      those LTD Crown Victorias.

(Docket Entry No. 27, Exhibit 1, p. 44.)

Plaintiff then reviewed the videotape on the record with defense counsel, and

described the videotaped events as they were replayed. Plaintiff initially narrated an

unidentified portion of the videotaped events as follows:

Now I'm talking to Patmon. She was putting that big gold bangle back on my
arm. I'm totally livid. Put your foot up there, Ding Ding.[4] Disrespect them.
Come on, take me in, I'm disrespecting you. 'Get your foot off my car.'
'Come pull it off.' What time is that in the morning, 9:27? Damn, that's not
dark. That's – that's early in the morning, in broad daylight. Patmon's going
back – Patmon's going back toward the back with his hands on his pistol.
'Come on, take it off.'[5]

_____

[4]"Ding Ding" is an alias used by plaintiff. (Docket Entry No. 1, p. 4.)

[5]Construed in context of the videotape, this final sentence appears to refer back to Patmon's
order for plaintiff to remove his foot from the police car.

16

*Id.*, p. 65-66.  Plaintiff then narrated the entire police videotape from beginning to end, as

follows:

> A:    This right after they sounded the siren in my ear.  They stopped me right there on the corner of what street?  What is that?  Bev – no, that's Mulcahy.  Mulcahy, Avenue E.  This is Officer Chatman ordering me to get my hands out of my pocket.  *At this point he's asking me if I have anything in any pocket I could – that could cause him injury.  I told him, 'Yeah, Chapstick.'*

> Q:    For the record, that's 9:18:43 roughly.[6]

> A:    Yeah.  At this point he's telling me to assume the position, and I'm assuming the position.  And I'm talking – I'm swearing.

> Q:    That's still at 9:18.

> A:    Those are the – he's just put all my papers that I had in my hand from my job where I had been working out of state helping the Katrina and Hurricane Rita people and coming from Reverend Johnson's house.  As a matter of fact, those were some letters – some documents that I was passing – mailing off for my benefits.  This time Chatman is – he's patted me down.  He's going through my pockets, going through all my personal effects.

> Q:    At 9:19:52?

> A:    Yes.  My wallet, looking at my cigarettes.  I'm steady swearing, wanting to know why I'm being stopped, why I am being stopped.  And that's when he started just doing the natural stop and pat-down.

> A:    At 9:20:25?

---

[6]These numbers appearing throughout the deposition refer to the on-screen videotape time-lapsed counter.

Q:      Yes. And that's a natural pat-down. Now he's at that point he's
        starting to handle me.

Q:      It's at 9:20:43.

A:      Now he's searching through my cap. Now, this is when I
        suspected in my mind that they're looking for contraband drugs.
        I'm asking him, you know, 'What are you looking for? Why –
        what – what you doing – the hell you doing? Man, what the
        fuck – yeah, get out of my – get out of my – my shoes' – I'm
        responding. 'Get out of my' – 'Here, take the motherfuckers.
        What you want with my shoes? What are you looking for? Tell
        me, what are you looking for?'

Q:      That's at 9:21:18?

A:      'Here are my socks, too. What are ya'll looking for? Here,
        here's the other one. Here's the other sock, too. Now, tell me
        what the hell you looking for. This ground is cold. Hey, looky
        here. Look. Get going, man. This ground is cold. This ain't
        fucking funny.' I'm talking to Patmon here. 'This ain't funny.
        What the hell you looking for?'

Q:      And where is Patmon at this point?

A:      In the car giving directions to Chatman. Watch Chatman's eyes.
        'Here, have the cap.' Now my glasses. All right. 'What the
        hell' – you know, unbutton my belt. 'Man, you sure are
        tripping.' 'Yeah, take the motherfuckers. What are you looking
        for? Here, the shirt too, goddammit. Here, what the hell you
        looking for? Man, you kiss my ass.' I'm hollering at the people
        coming over laughing and going on.'

Q:      Now, at this point what is Officer Chatman saying to you? And
        this is at 9:22:27, just before that.

A:      At this point he's telling me if I continue on in this manner that
        he'll put a disorderly conduct on me, and watch my response.
        'Fuck it. Let's go. You got pancakes? I'm hungry. You got

> pancakes? Fuck it. You got pancakes. I'm hungry. Let's go.'
> I wish you had the audio on that. You'd be laughing.

*Id.*, pp. 67-69 (emphasis added).

> Q:     Did Officer Chatman ask you to put your clothes back on?
>
> A:     No. I put my clothes back on, man. I'm cold.

*Id.*, p. 70. In his narration of the videotaped incident, plaintiff did not testify that the officers

ordered him to remove his shirt and pants. Again, no probative summary judgment evidence

is presented supporting plaintiff's claim that the officers forced him to remove his shirt and

pants in public.

v.     Summary Judgment Affidavits

In his affidavit submitted in support of the motion for summary judgment, Patmon

testified, in relevant part, as follows:

> 2.     I am a Detective with the City of Rosenberg police department. On
> March 4, 2006, the day of the stop of Sherman Wilson, I was on patrol with
> Officer Chatman. I participated in the stop by directing the on-board camera
> in the patrol car. I remained in the vehicle during the stop and was unable to
> hear Chatman's instructions to Wilson. I observed the stop and pat down of
> Wilson through the windshield of the patrol car. Attached as Exhibit 5 is a
> true and correct copy of the on-board recording of the stop of Wilson on
> March 4, 2006. The view shown in this reco[r]ding is similar to my view of
> events on the day of the stop. I made this recording at the time of the stop.
> Such a recording is kept in the course of the regularly conducted business
> activity of the City of Rosenberg Police Department, and it is the regular
> practice of the Department to make such a recording. This recording sets forth
> the activities of the City of Rosenberg Police Department.
>
> 3.     On March 4, 2006, Chatman and I were patrolling an area of Rosenberg
> known for drug activity. While on patrol, Chatman and I observed Wilson

walking in the street in the same direction as the traffic on a two-way street with one lane of traffic in each direction. I was familiar with Wilson's reputation in the community as well as his history with our department. Wilson is a known criminal with a history of illegal drug use and arrests for disruptive and violent behavior, and he has served time in the Texas Department of Criminal Justice on four occasions. By computer mounted in the patrol car, we had access to Wilson's criminal history through the Texas Law Enforcement Telecommunications System [TLETS].

4.   During the stop, I observed Chatman conduct a routine frisk of Wilson. *I did not instruct Wilson to remove any articles of clothing. I did not hear Chatman instruct Wilson to remove his shirt or pants. Wilson appeared agitated during the stop. I observed Wilson acting in an angry manner before removing his own shirt and pants. From my perspective, it appeared that Wilson removed his clothes voluntarily.* The stop lasted approximately ten minutes. Wilson put his clothes back on before walking away. Chatman and I did not place Wilson in the patrol car, take him to the police station, or write him a ticket or citation during the stop. Wilson was free to leave at the end of the stop.

5.   As a police officer responsible for patrolling the streets of Rosenberg on March 4, 2006, I was responsible for stopping individuals I observed breaking the law.

(Docket Entry No. 27, Exhibit 2, pp. 1-2, emphasis added.)

Lieutenant Colin Davidson also submitted an affidavit in support of the motion for summary judgment, in which he testified as follows:

2.   I an a Lieutenant with the City of Rosenberg Police Department. I conducted an interview of Sherman Wilson on April 20, 2006 in response to a complaint about Officer Patmon and Officer Chatman's stop on March 4, 2006. Exhibit 9 is a true and correct copy of a document recording Wilson's verbal citizen complaint. I recorded the interview in my vehicle. I concluded that Wilson's complaint was unfounded based on the interview and a review of the on-board recording of the stop. Exhibit 10 is a true and correct copy of the letter concluding the investigation that I sent to Sherman Wilson. This

letter sets forth the factual findings resulting from an investigation conducted by the City of Rosenberg Police Department.

3.   Exhibit 7 is a true and correct copy of the transcript of the recording of the interview of Sherman Wilson that I conducted on April 20, 2006.  I made this recording at the time of the interview.  It records statements made by Sherman Wilson about his encounters with Officers Chatman and Patmon on March 4, 2006.  This record was kept in the course of a regularly conducted business activity of the City of Rosenberg Police Department, and it was the regular practice of the Department to make such a record.  This recording sets forth the activities of the City of Rosenberg Police Department.

4.   From my professional knowledge and experience as a police officer in the City of Rosenberg, I am aware that the area Officer Patmon and Officer Chatman were patrolling where the stop occurred on March 4, 2006 is an area known for drug activity.

*Id.*, Exhibit 3, pp. 1-2.

Patmon's affidavit establishes that, on March 4, 2006, he observed plaintiff walking down the wrong side of the street; that he did not instruct plaintiff to remove any clothing; that he did not hear Chatman order plaintiff to remove his shirt or pants; and that plaintiff appeared to voluntarily remove his own shirt and pants in anger or agitation.

vi.   Plaintiff's Response to the Motion for Summary Judgment

In his response to the motion for summary judgment, plaintiff states that, "I rest my case on the strength of the contents contained in the [police] video," and that, as to "the rest of the mud slinging, I cannot dignify [it] with a response." (Docket Entry No. 33, pp. 2-3.) Plaintiff also complains that on December 22, 2007, he again saw Officer Patmon, who appeared "upset" by, and "ranted and raved" about, the instant lawsuit.  *Id.*, p. 1.  Plaintiff

argues that this recent behavior shows Patmon is "out of control and handles himself with wreckless (sic) abandon." *Id.*

Plaintiff fails to present probative summary judgment evidence in his response that the officers forced him to remove his shirt and pants during the stop. Accordingly, he presents no probative summary judgment evidence that the officers conducted a public strip search on him.

### C.    Legal Analysis

The uncontroverted probative summary judgment evidence shows that the officers observed plaintiff walking down the street facing away from on-coming traffic the morning of March 4, 2006. Thus, they observed plaintiff committing a misdemeanor offense under section 552.006 of the Texas Transportation Code.[7]

Generally, a law enforcement officer may briefly detain an individual to investigate possible criminal behavior where the officer can "point to specific and articulable facts, which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion." *Terry v. Ohio*, 392 U.S. 1, 23 (1968); *Carmouche v. State,* 10 S.W.3d 323, 328 (Tex. Crim. App. 2000). A state traffic violation committed in an officer's presence authorizes an initial stop under *Terry*. *Armitage v. State*, 637 S.W.2d 936, 939 (Tex. Crim.

---

[7]Section 552.006 requires pedestrians to use an available sidewalk, or absent a sidewalk, walk on the left side of the road or the side facing oncoming traffic. Plaintiff presented no probative evidence controverting Patmon's affidavit testimony that he observed plaintiff "walking in the street in the same direction as the traffic on a two-way street with one lane of traffic in each direction." (Docket Entry No. 27, Exhibit 2, pp. 1-2.)

App. 1982).  *See also Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001) (holding that "if an officer has probable cause to believe than an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender.")  Here, the police officers observed plaintiff walking down the street facing away from on-coming traffic; accordingly, they observed plaintiff violating state traffic laws and were entitled to conduct an initial stop.  *See, e.g., Bell v. State*, 2007 WL 1219410 (Tex. App. – Beaumont 2007, no. pet.).

As part of a *Terry* stop, an officer may then conduct a limited search of a person's outer clothing when an officer reasonably believes the person may be armed and dangerous. *Carmouche,* 10 S.W.3d at 329.  The purpose of the limited search for weapons is to allow the officer to pursue the investigation without fear of violence.  *Id.*  The test to determine the reasonableness of a search and seizure is "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place."  *Terry*, 392 U.S. at 19-20.  To assess the reasonableness of an officer's conduct, specific and articulable facts must appear in the record which would warrant a self-protective search for weapons.  *Terry*, 392 U.S. at 21.  Here, plaintiff admits that, when asked by Chatman whether he was carrying anything that could injure the officer, plaintiff responded, "Yeah, Chapstick." (Docket Entry No. 27, Exhibit 1, p. 67.) As plaintiff answered in the affirmative, Chatman was entitled to conduct a weapons search for his own protection.

The Supreme Court described a *Terry* frisk as follows: "The officer must feel with sensitive fingers every portion of the prisoner's body. A thorough search must be made of the prisoner's arms and armpits, waistline and back, the groin and area about the testicles, and entire surface of the legs down to the feet." 392 U.S. at 17 n. 13 (citation omitted). In the instant case, the probative summary judgment evidence shows that Chatman performed a *Terry* frisk, or pat-down, of plaintiff prior to plaintiff's removal of his shirt and pants. Indeed, it was during Chatman's performance of the *Terry* frisk around plaintiff's waistline, back, and groin area that plaintiff, highly agitated by the touching, swore at the officers and began removing his own pants and shirt.

Regardless of circumstances justifying a search for weapons, a search may be conducted without probable cause or a warrant if it is conducted pursuant to consent. *United States v. Richard*, 994 F.2d 244, 250 (5th Cir. 1993). However, when police officers rely upon consent as the basis for a warrantless search, they have no more authority than they have apparently been given by the consent. *United States v. Mendoza-Gonzalez*, 318 F.3d 663, 666 (5th Cir. 2003). Under the Fourth Amendment, the standard for measuring the scope of a suspect's consent is that of objective reasonableness – what the typical reasonable person would have understood by the exchange between the officer and the suspect. *Id.* at 667. This Court cannot conclude that a reasonable person would have understood the exchange between plaintiff and the officers to entail the removal of plaintiff's pants and shirt along a public road. Thus, even in light of plaintiff's consent to a search, the Court must

24

review the probative summary judgment evidence to determine whether plaintiff raised a genuine issue of material fact as to whether the officers conducted a strip search on him in violation of his Fourth Amendment rights.

This Court's careful consideration of the record fails to reveal any probative summary judgment evidence that the officers ordered plaintiff to remove his shirt and pants during the stop, or that the police officers left him walking down the street "butt naked" after the search. Because the uncontroverted evidence in the instant case shows that the officers observed plaintiff committing a criminal offense by walking down the wrong side of the street, and that plaintiff consented to being searched after he was stopped, the Court need not reach the issue of whether the officers had probable cause to conduct a pat-down search or frisk of plaintiff. *See U.S. v. Zavala*, __F.3d__, 2008 WL 3877232 (5th Cir. 2008). Further, the uncontroverted probative evidence does not show that the officers ordered plaintiff to remove his pants and shirt. That plaintiff may have removed his own shirt and pants in order to circumvent what he perceived as unwanted physical contact during the *Terry* search does not establish an unlawful search. Plaintiff raises no genuine issue of material fact precluding summary judgment regarding his Fourth Amendment claim.

### D.      Supervisory Liability

Plaintiff claims that Patmon, as a supervising officer, instructed and directed Chatman to perform a strip search of plaintiff. (Docket Entry No. 27, Exhibit 1, pp. 69-70.) This claim factually fails for the same reason plaintiff's primary claim fails – he presents no

probative summary judgment that the officer strip searched him. As plaintiff fails to establish that the complained-of strip search occurred, he cannot prevail on a claim that Patmon instructed Chatman to perform the strip search. Regardless, plaintiff presents no probative summary judgment evidence, and the record does not show, that Patmon told Chatman to remove plaintiff's shirt and pants during the stop.

### E.    Conclusion

Because plaintiff's claims against Patmon have no factual evidentiary substance, the Court finds that there is no genuine issue of material fact with regard to his claim that Patmon violated his Fourth Amendment rights by forcing him to undergo a public strip search. Defendant Patmon is entitled to summary judgment dismissing plaintiff's claims against him.

### III.  CONDITIONAL MOTION TO COMPEL

Defendant Patmon filed a conditional motion to compel, requesting the Court to order plaintiff to appear and answer certain questions he refused to answer during his deposition of November 1, 2007. (Docket Entries No. 30, 32.) Defendant Patmon requests this relief only in the event the Court were to deny his motion for summary judgment. As the Court is granting the motion for summary judgment, the conditional motion to compel (Docket Entries No. 30, 32) is **DENIED AS MOOT**.

## IV. CONCLUSION

For the above reasons, the Court **GRANTS** Kenneth Patmon's motion for summary judgment (Docket Entry No. 27), and **DISMISSES** plaintiff's claims against him with prejudice.

The Clerk will provide a copy of this order to the parties.

Signed at Houston, Texas, on this the ___ day of September, 2008.

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE